ERIC N. VITALIANO, United States District Judge
Plaintiff Willie Miller filed this action against defendants Officer Timothy Terrillion of the New York City Police Department ("NYPD") and the City of New York (the "City"), alleging violations of his constitutional rights as permitted by 42 U.S.C. § 1983. Compl., Dkt. 1. Defendants move for partial summary judgment. Mot. for Summ. J., Dkts. 41-44. For the reasons set forth below, defendants' motion is granted to the extent that plaintiff's equal protection and municipal liability claims are dismissed but otherwise denied as to his due process claim.
Background
The parties agree on the following facts, which mark the general contours of the underlying incident. On July 23, 2015, Miller was banned from all New York City Housing Authority ("NYCHA") property, effective August 17, 2015, including the Hammel Houses project in Far Rockaway, Queens. Defs.' R. 56.1 Stmt. ¶¶ 1-2, Dkt. 43; Akina Decl. Ex. B, Dkt. 44-2. On August *220 22, 2015, five days after the ban had become effective, at around 8:30 p.m., Miller, his friend Edward Fields, and two other men entered Fields's car parked on Rockaway Beach Boulevard, a public street running along the southern boundary of Hammel Houses. Defs.' R. 56.1 Stmt. ¶ 6; Miller Dep. at 69-71, Sullivan Decl. Ex. 1, Dkt. 47-1, Akina Decl. Ex. C, Dkt. 44-3. Shortly after Fields started driving, the car was pulled over by Officer Terrillion, who arrested Miller and took him to the 100th precinct. Defs.' R. 56.1 Stmt. ¶ 8; Pl.'s R. 56.1 Stmt. at 1, Dkt. 46; Sullivan Decl. Exs. 2-4, Dkts. 47-2-47-4. The resulting criminal complaint charged Miller with criminal trespassing in the third degree under New York Penal Law § 140.10 (E), for unlawful entry into a public housing project. Sullivan Decl. Ex. 2. In September 2015, Miller received an adjournment in contemplation of dismissal on the trespassing charge. Compl. ¶ 18. Notwithstanding, the devil is in the details, since the motion turns on whether Miller, just prior to his arrest, actually entered upon the property of NYCHA's Hammel Houses.
Standard of Review
A district court must grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) ; see also Celotex Corp. v. Catrett , 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). A court's responsibility in assessing the merits of a summary judgment motion is not to try issues of fact, but merely to "determine whether there are issues of fact to be tried." Sutera v. Schering Corp. , 73 F.3d 13, 15-16 (2d Cir. 1995) (quoting Katz v. Goodyear Tire & Rubber Co. , 737 F.2d 238, 244 (2d Cir. 1984) ). The moving party bears the burden of demonstrating that there is no genuine issue as to any material fact, see Jeffreys v. City of New York , 426 F.3d 549, 554 (2d Cir. 2005), and the motion court will resolve all ambiguities and draw all permissible factual inferences in favor of the party opposing the motion, see Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc. , 391 F.3d 77, 83 (2d Cir. 2004) ; Gummo v. Vill. of Depew , 75 F.3d 98, 107 (2d Cir. 1996) ("If, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper.").
If the moving party meets its initial burden of demonstrating the absence of a disputed issue of material fact, the burden shifts to the nonmoving party. Celotex Corp. , 477 U.S. at 330, 106 S.Ct. 2548. The nonmoving party may not rely solely on "conclusory allegations or unsubstantiated speculation" to defeat a motion for summary judgment. Scotto v. Almenas , 143 F.3d 105, 114 (2d Cir. 1998). Instead, the nonmoving party must "make a showing sufficient to establish the existence of [each] element essential to that party's case .... since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. , 477 U.S. at 322-23, 106 S.Ct. 2548. If the evidence favoring the nonmoving party is "merely colorable, or is not significantly probative, summary judgment may be granted." Anderson v. Liberty Lobby, Inc. , 477 U.S. 242, 249-50, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) (internal citations omitted).
Discussion
Defendants move for summary judgment on Counts Two and Three, leaving intact plaintiff's claims for false arrest and imprisonment under Count One.
*221 I. Count Two
Defendants argue that Count Two of the complaint, asserting the deprivation of a Mulligan stew of constitutional rights "without limitation" under the First, Fourth, Fifth, Ninth, and Fourteenth Amendments, fails to state a claim as a matter of law. Defs.' Mem. at 3-4, Dkt. 42. To the extent that Miller alleges a deprivation of his Fourth Amendment rights, defendants contend that it is subsumed by his first claim for false arrest, as is any alleged due process violation under the Fourteenth Amendment. Id. at 5-6. To the extent that he alleges a claim based on the denial of the right to a fair trial, defendants claim that it is inadequately pleaded and that he has not adduced evidence pointing to a material fact in dispute. Defs.' Reply Mem. at 35, Dkt. 48. In addition, defendants decry the insufficiency of plaintiff's equal protection claim, which notes that Miller is black and Officer Terrillion white but fails to allege that Miller's arrest was racially motivated. Defs.' Mem. at 6-8.
Conceding the legal point, Miller streamlines the second count of his complaint in acknowledgement that claims for generalized deprivations of civil rights are not viable. See Johnson v. City of New York , No. 06-CV-0630 (KAM), 2010 WL 2771834, at *6 (E.D.N.Y. July 13, 2010) (dismissing generalized deprivation claim). Assigning any Fourth Amendment claim to Count One, Miller now characterizes Count Two as asserting a due process claim based on the violation of the right to a fair trial resting on the alleged fabrication of evidence. He also seeks to interpose in that count an equal protection claim purportedly based on racial profiling. PL's Opp'n Mem. at 4-8, Dkt. 45.
A. Fair Trial Claim
The first defense attack is procedural. They contend that the claim was not pleaded but merely raised, impermissibly, in Miller's opposition to summary judgment. Defs.' Reply Mem. at 3-4. In his opposition, plaintiff points to factual allegations in the complaint that Officer Terrillion "created false police reports to justify [his] arrest" and that he "fabricated and concocted the allegation that [Miller] was upon the premises where [Officer Terrillion] claims he trespassed."[1] Pl.'s Opp'n *222 Mem. at 5. With leave to amend, especially in a civil rights context, to be freely given, Rogers v. Miller , No. 16-CV-3610 (AMD)(VMS), 2018 WL 1136600, at *3 (E.D.N.Y. Mar. 2, 2018), there is no need to belabor anew the procedural lamentations.
Substantively, to prevail on a fair trial claim for falsification of evidence, "an arrestee must prove ... that the officer created false information, the officer forwarded the false information to prosecutors,... the false information was likely to influence a jury's decision," and the plaintiff suffered "a deprivation of life, liberty or property as a result." Garnett v. Undercover Officer C0039 , 838 F.3d 265, 279-80 (2d Cir. 2016). Allegations that a criminal charge arose out of a police officer's false statements support a fair trial claim, independent of any false arrest claim, even where the case did not ultimately proceed to trial. See Ricciuti v. N.Y.C. Transit Auth , 124 F.3d 123, 130 (2d Cir. 1997) ("When a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial"); Apostol v. City of New York , No. 11-CV-3851 (RRM)(CLP), 2014 WL 1271201, at *5 (E.D.N.Y. Mar. 26, 2014) (acceptance of an adjournment in contemplation of dismissal "does not preclude a fair trial claim") (collecting cases), aff'd , 607 F. App'x 105 (2d Cir. 2015) ; Nibbs v. City of New York , 800 F. Supp. 2d 574, 575 (S.D.N.Y. 2011) (denial of right to fair trial is "separate and distinct cause of action" from false arrest even where based on same evidence). While the right to a fair trial is enshrined in the Sixth Amendment, the Fourteenth Amendment's due process clause presents another valid constitutional source for such a claim. See, e.g., United States v. Gonzalez-Lopez , 548 U.S. 140, 146, 126 S. Ct. 2557, 165 L. Ed. 2d 409 (2006) ("The Constitution guarantees a fair trial through the Due Process Clauses, but it defines the basic elements of a fair trial largely through the several provisions of the Sixth Amendment"); Garnett , 838 F.3d at 276 n.6 ("Whether this right is rooted in the Sixth Amendment or Fifth and Fourteenth Amendments, or both, is an issue we need not decide because the constitutional harm resulting from the falsified information at issue is in any event redressable").
Defendants argue that Miller has not pointed to any record evidence showing what information communicated by Officer Terrillion to prosecutors was falsified nor has he shown what effect such information might have on a jury. Defs.' Reply Mem. at 5. But, defendants' argument skips a step; they have failed on this motion to show the absence of a disputed issue of material fact. Reduced to the raw, Miller testified at his deposition that he never entered NYCHA property when he was visiting the area near the Hammel Houses, providing a detailed account of the route he says he took from nearby Dayton Towers to his friend's car-an account that flat-out contradicts the statement provided by Officer Terrillion which is the sole basis for the trespassing charge. Compare Miller Dep. at 67-73, 80, with Terrillion Dep. at 20-27, 31, 34, 48-49, Akina Decl. Ex. D, Dkt. 44-4, Sullivan Decl. Ex 5, Dkt. 47-5. Significantly, moreover, while Officer Terrillion suggests that video surveillance *223 footage was taken at Hammel Houses on the night Miller supposedly trespassed, defendants have offered no video evidence to corroborate Officer Terrillion's account. Terrillion Dep. at 71. Thus, there are two competing tales with no objective corroboration. Such disputes of fact, hinging on witness credibility determinations, must be resolved by a jury.
Furthermore, despite the movant's burden to show the absence of a genuine dispute of material fact, Officer Terrillion's police reports, if anything, do the opposite. The reports contain at least one misstatement-incorrectly listing the address where the alleged offense took place. Sullivan Decl. Exs. 3-4; Terrillion Dep. at 60-61. Worse yet, the professed error found its way into the criminal complaint that Officer Terrillion reviewed and swore upon penalty of perjury was accurate. Sullivan Decl. Ex. 2; Terrillion Dep. at 64-67. The police reports, moreover, give different descriptions regarding the offense location, with one report describing it as Hammel Houses and the other as a "public sidewalk" abutting Hammel Houses. Sullivan Decl. Exs. 3-4. Since the primary factual dispute concerns whether Miller entered NYCHA property or he passed by it on a public sidewalk, this discrepancy is material. Although Officer Terrillion testified at his deposition that, in the course of his patrol, he watched Miller crossing Hammel Houses, he also answered "no" in completing the police report query regarding whether the incident was "visible by patrol". Terrillion Dep. at 23-25, 31; Sullivan Decl. Ex. 4. Therefore, viewing these facts in the light most favorable to the non-movant, Officer Terrillion's account of events is inconsistent with the police reports he prepared upon penalty of perjury then forwarded to prosecutors, and which became the basis for the criminal complaint against Miller. It supports a due process claim that Miller was denied the opportunity of a fair trial. See Keller v. Sobolewski , No. 10-CV-5198 (FB)(RML), 2012 WL 4863228, at *5 (E.D.N.Y. Oct. 12, 2012) (denying summary judgment on fair trial claim where "[o]n plaintiff's version of events, a reasonable jury could find that [defendant officer] lacked probable cause to make the arrest, and that she then knowingly forwarded false information to prosecutors"). Accordingly, defendants' motion for summary judgment is denied with regard to plaintiff's fair trial claim.
B. Equal Protection Claim
The mere allegation in the complaint that Miller and the passengers in the vehicle stopped by NYPD were stopped because they were African American does not, defendants contend, make out an equal protection/race profiling claim without asserting differential treatment from other similarly situated individuals. Defs.' Mem. at 7-8. Defendants readily concede, though, that Miller may be able to pursue an equal protection claim under multiple potential theories, but protest that Miller fails to choose one and support it with any record evidence of racial profiling. Defs.' Reply Mem. at 6-8. Boldly going further, defendants, in fact, contend that Miller's claim reflects race animus of its own, since it "essentially asks the Court to conclude either that every police action with a black male is racially motivated, or that [Officer] Terrillion committed misconduct based on the color of [Officer] Terrillion's skin-the very definition of racial profiling." Defs.' Reply Mem. at 9.
Miller parries that his claim seeks to draw on a 2013 decision in Floyd v. City of New York , 959 F. Supp. 2d 540 (S.D.N.Y. 2013), in which the plaintiff's there established through statistical and anecdotal evidence "that the NYPD implements its policies regarding stop and frisk in a manner that intentionally discriminates based on *224 race." 959 F. Supp. 2d at 663. Miller argues that he should be permitted to rely on, rather than be required to replicate, that body of proof. Miller, more specifically, seeks to incorporate the Floyd record here, particularly the evidence "establishing that NYPD officers stop blacks and Hispanics with less justification than whites resulting in a discriminatory effect and motivated by a discriminatory purpose". Pl.'s Opp'n Mem. at 6.
Plaintiff goes on to argue that the Floyd decision establishes discriminatory intent in this case and permits the reasonable inference to be drawn that there was a reason he was stopped other than Officer Terrillion's bogus claim that he was trespassing, i.e. , that he "was the subject of racial profiling with a discriminatory purpose and effect." Pl.'s Opp'n Mem. at 7. The argument, plaintiff points out, is consistent with the fact that the "occupants of the vehicle in which Plaintiff was arrested were all young black males," while Officer Terrillion and "all other officers who participated in the stop were all white." Pl.'s Opp'n Mem. at 3.
In counterpoint to plaintiff's proposed shortcut to liability, the rules of practice require litigants to develop their own case records. See Fed. R. Civ. P. 56 (c)(1)(A) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by ... citing to particular parts of materials in the record"); Local Civ. R. 56.1(d) ("Each [factual] statement ... must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)."). Naturally, a court may consider the legal principles underpinning Floyd to the extent they are relevant, but it must apply them to the facts of the pending case.[2] Those principles are to be applied to a record developed during pre-trial discovery, not one embellished selectively by facts taken from another litigation. Plaintiff's proposed use of Floyd , in net effect, would mean that the arrest of a Black or Hispanic suspect by a NYPD officer of a different race gives rise to a cognizable equal protection claim that automatically survives summary judgment. That is not the law.
Whatever the record, "[t]o state a race-based claim under the Equal Protection Clause, a plaintiff must allege that a government actor intentionally discriminated against him on the basis of his race," which may be asserted in various ways. Brown v. City of Oneonta, New York , 221 F.3d 329, 337 (2d Cir. 2000), overruled in part on other grounds by Gonzaga Univ. v. Doe , 536 U.S. 273, 122 S. Ct. 2268, 153 L. Ed. 2d 309 (2002). A plaintiff may point to an express racial classification, "identify a facially neutral law or policy that has been applied in an intentionally discriminatory manner" or "allege that a facially *225 neutral statute or policy has an adverse effect and that it was motivated by discriminatory animus." Id. (citations omitted). Discriminatory intent requires proof that "a discriminatory purpose has been a motivating factor in the challenged action," i.e. , that "those who carried out the challenged action selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." Floyd , 959 F. Supp. 2d at 571 (emphasis in original) (internal citations omitted). Such evidence may be circumstantial, since "discriminatory intent is rarely susceptible to direct proof." Id. (citation omitted).
Framing his equal protection claim as "racial profiling with a discriminatory purpose and effect," Miller argues that the Court should presume adverse effect because he has shown, presumably through the embellishment of the record by incorporation of unspecified portions of the Floyd record, that the traffic stop was motivated by discriminatory intent. Pl.'s Opp'n Mem. at 7. Quite to the contrary, however, Miller has not established any such intent. He presents no evidence that, in stopping plaintiff and his friends, Officer Terrillion acted in an intentionally discriminatory manner or was even partially motivated by discriminatory animus. See Valdez v. City of E. Hartford , 26 F. Supp. 2d 376, 384 (D. Conn. 1998) (summary judgment for defendant on equal protection claim arising out of traffic stop where "no racial or ethnic slurs were uttered"); Ali v. Connick , 136 F. Supp. 3d 270, 280 (E.D.N. Y. 2015) ("officers' use of racial epithets may be regarded as direct evidence of racial animus"); Coward v. Town & Vill. of Harrison , 665 F. Supp. 2d 281, 303 (S.D.N.Y. 2009) (summary judgment denied where plaintiff's allegation that "he was the only African-American in the park at the time of his arrest" raised inference of racially discriminatory motivation). Beyond plaintiffs' description of the various individuals' racial identities, there is no evidence that race was a factor, much less a motivating factor, in the traffic stop or his arrest. "The mere fact that Defendant is white and Plaintiff is black does not mean that Defendant's arrest of Plaintiff was motivated by Plaintiff's race." Williams v. Schultz , No. 9:06-CV-l 104, 2008 WL 4635383, at *6 (N.D.N.Y. Oct. 16, 2008) (summary judgment for defendant on equal protection claim).
Beyond that, Miller tries to side-step another shortfall in the record evidence. He contends that he need not "show a better treated, similarly situated group of individuals of a different race" to support his equal protection claim. Pl.'s Opp'n Mem. at 6. Certainly, that requirement does not apply where a plaintiff challenges a law or policy containing "an express, racial classification subject to strict judicial scrutiny." Brown , 221 F.3d at 337. But, that is not the case here, since Miller alleges "racial profiling", or selective prosecution on the basis of race. This sort of claim requires a showing "that similarly situated individuals of a different race were not prosecuted." Id. (citing United States v. Armstrong , 517 U.S. 456, 465, 116 S. Ct. 1480, 134 L. Ed. 2d 687 (1996) ); see also Pyke v. Cuomo , 258 F.3d 107, 109 (2d Cir. 2001) (allegations of similarly situated individuals required for selective prosecution claim because "courts grant special deference to the executive branch in the performance of the 'core' executive function of deciding whether to prosecute").
In order to maintain a selective prosecution claim, precedent is clear that a complainant must plausibly plead and prove "(1) [that] the person, compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible *226 considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." Freedom Holdings, Inc. v. Spitzer , 357 F.3d 205, 234 (2d Cir. 2004) (citation omitted). The evidentiary cupboard here, however, is bare, containing no information concerning disparate treatment of similarly situated individuals or any other facts suggesting selective prosecution. The complaint, instead, merely alleges that Miller and his friends, "African American males between the ages of 27 to 31", were stopped "due solely to racial profiling." Compl. ¶ 12. But, after conducting discovery, plaintiff, other than alluding to echos of Floyd , makes no showing to support this conclusory allegation of racial profiling in this case. Indeed, in his Rule 56.1 Statement, Miller simply reiterates the theme that the officers involved in the traffic stop were all white and plaintiff and his friends "were young black men." Pl.'s R. 56.1 Stmt, at 2. Drawing all permissible factual inferences from the essentially undisputed racial disparity between the arresting NYPD officers and the arrestees in this instance in Miller's favor, those facts and inferences alone are insufficient to sustain a selective prosecution claim. See Azana v. City of W. Haven , No. 3:10-CV-883 (JBA), 2012 WL 264559, at *10 (D. Conn. Jan. 27, 2012) (granting summary judgment to defendants where plaintiff's pointed "to no facts in the record that show other similarly-situated non-Hispanic individuals were treated differently with respect to noise and public-disturbance complaints"). Accordingly, defendants' motion for summary judgment is granted with regard to plaintiff's equal protection claim.
II. Municipal Liability
To establish municipal liability under § 1983, plaintiff must show "(1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury." Roe v. City of Waterbury , 542 F.3d 31, 36 (2d Cir. 2008) (citing Monell v. Dep't of Social Servs. , 436 U.S. 658, 690-91, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978) ). A municipal employee's commission of a tort is not sufficient to satisfy the policy requirement, which may be shown by, inter alia , "a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware", or "a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees." Galgano v. Cty. of Putnam, New York , No. 16-CV-3572 (KMK), 2018 WL 4757968, at *18 (S.D.N.Y. Sept. 28, 2018) (citation omitted).
On this point, more than any other, Miller's briefing relies on Floyd as a deus ex machina made essential since the complaint pleads factually empty allegations regarding the City's policies, charging that unnamed police officers generally failed to perform in accordance with a "reasonable prudent" officer standard, and that the City hired and retained unfit officers, failed to exercise care in instructing them, failed to adequately train and supervise employees, and failed to establish "meaningful" disciplinary and training procedures for officers accused of misconduct. Compl. ¶ 29. Bringing the conclusory claims closer to home, Miller goes on to allege that Officer Terrillion's conduct conformed to "long-standing" City policies which the City declined to "terminate" despite knowledge "of such illegal de facto policies and practices." Id. ¶¶ 32-33.
Closer examination underscores the hollowness of Miller's pleadings and proof Specifically, plaintiff's Rule 56.1 statement *227 does not even reference the City, much less its practices and policies. See generally Pl.'s R. 56.1 Stmt. The exhibits in the record primarily concern the August 22 incident, without providing any evidence concerning unconstitutional City policies causally connected to that incident. For the reasons discussed above regarding Miller's equal protection claim, he cannot incorporate by fiat the Floyd record as a substitute for his own empty discovery. His proposed shortcut is made all the more inappropriate given that the record in Floyd documented stop-and-frisk policies between 2004 and 2012, whereas the incident Miller complains of did not take place until 2015. See Nardoni v. City of New York , 331 F. Supp. 3d 116, 128 (S.D.N.Y. 2018) (granting summary judgment for defendants on Monell claim where plaintiff "produced no evidence that [stop-and-frisk] was still in place in September 2015 when he was arrested"); Sullivan v. City of New York , No. 17-CV-3779 (KPF), 2018 WL 3368706, at *14-16 (S.D.N.Y. July 10, 2018) (dismissing Monell claim where allegations that City was slow to implement post- Floyd reforms did not establish causal link between stop-and-frisk policy and plaintiff's arrest in May 2016); see also Peterec v. City of New York , No. 14-CV-0309 (RJS), 2015 WL 1027367, at *7 (S.D.N.Y. Mar. 6, 2015) ( Monell claim relying on mere references to Floyd dismissed as "patently inadequate to allege a policy or custom of the City, let alone allege that that policy or custom is the one that gave rise to Plaintiff's alleged violation"); compare with Bishop v. City of New York , No. 13-CV-9203 (AJN), 2016 WL 4484245, at *4 (S.D.N.Y. Aug. 18, 2016) (denying motion to dismiss where pro se plaintiff provided statistics, cited whistleblower reports, and connected Floyd's factual findings to plaintiff's stop in 2010). Floyd's record of City policies in place up to 2012, deemed unconstitutional in 2013, and thereafter subjected to judicially monitored reform in pursuit of constitutional compliance does not, on its own, point to the existence of unconstitutional City policies in effect in 2015.[3]
Furthermore, the empty evidentiary record does not enable plaintiff to weave a Monell claim out of thread hanging from a single incident. Even assuming the success of Miller's false arrest and fair trial claims, it is well-established that a municipality "may only be held liable when the municipality itself deprives an individual of a constitutional right" through a policy or custom, not just "a single instance of unconstitutional conduct" by a single, non-policy making employee of the City, like Officer Terrillion. See Newton v. City of New York , 566 F. Supp. 2d 256, 270-71 (S.D.N.Y. 2008) ; see also *228 Norton v. Town of Islip , 97 F. Supp. 3d 241, 265 (E.D.N.Y. 2015) ("A claim premised on an official policy or custom cannot be sustained on one alleged violation."); Galgano , 2018 WL 4757968, at *19 (collecting cases). Consequently, defendants' motion is granted with regard to plaintiff's claim for municipal liability.
Conclusion
For the foregoing reasons, defendants' motion is granted as to plaintiff's equal protection and municipal liability claims and denied as to plaintiff's due process claim.
The parties are directed to contact Chief Magistrate Judge Roanne L. Mann, to whom continued pretrial management of this matter has been respectfully referred.
So Ordered.

It should be noted that these are plaintiff's conclusory characterizations of what he pleaded rather than verbatim citations. Moreover, although defendants are correct that the assertion of new claims "at 'the last minute'... would 'inevitably prejudice the defendant,' especially where the moving party had no opportunity to conduct discovery on the issue", Arnold v. Storz , No. 00-CV-4485 (CBA), 2005 WL 2436207, at *5 (E.D.N.Y. Sept. 30, 2005) (internal citations omitted), the complaint did assert that the trespassing charge was based on Officer Terrillion's allegedly false statements and gave rise to a constitutional harm, albeit without labeling Count Two a "fair trial" claim in those very words. See Compl. ¶¶ 8, 11, 14, 15, 17. To be precise, plaintiff alleged that Officer Terrillion "falsely and wickedly charged the plaintiff with" trespassing, knowing full well that "the accusation was false and that the plaintiff had committed no such crime." Compl. ¶¶ 14, 17. This provides sufficient notice of the fair trial claim, as "a complaint need not plead 'the legal theory or theories and statutory basis supporting [a] claim, but only state 'facts that can be construed as alleging the existence' of such claims." Arnold , 2005 WL 2436207, at *5 (internal citations omitted); see also Johnson v. City of Shelby, Miss. , 574 U.S. 10, 135 S. Ct. 346, 346, 190 L. Ed. 2d 309 (2014) (reversing dismissal for failure to invoke § 1983 because federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted"); Sonds v. St. Barnabas Hosp. Corr. Health Servs. , 151 F. Supp. 2d 303, 308 (S.D.N.Y. 2001) ("a complaint alleging a civil rights violation under Section 1983 must contain specific allegations of fact that demonstrate a deprivation of constitutional rights"). Given the intertwined nature of the facts underlying the false arrest and fair trial claims, there is little risk that defendants have taken discovery in defense of the former that does not also aid their defense of the latter. At bottom, permitting the claim to go forward in the streamlined Count Two is more than amply justified, since the Court finds defendants received adequate notice of plaintiff's fair trial claim for falsification of evidence.

Plaintiff's in other § 1983 actions brought in New York federal courts have attempted to rely on the facts found in Floyd in the absence of their own record evidence, typically in support of Monell claims. Those attempts were also unsuccessful, for the same reasons given here. See, e.g., Brown v. City of New York , No. 11-CV-6379 (KBF), 2013 WL 4713561, at *3 n.1 (S.D.N.Y. Aug. 27, 2013) ("the parties and evidence in Floyd are not before this Court, nor can the Court take judicial notice that the policy or practice found in that case is identical to the conduct that occurred here"); Morgan v. City of New York , No. 12-CV-0704 (WFK), 2014 WL 3407714, at *7 (E.D.N.Y. July 10, 2014) ("The Court may take judicial notice of filings in other proceedings, but may not import the evidence and arguments from [Floyd ] to bolster Plaintiff's case."); see also Graham v. City of New York , No. 16-CV-4613 (NGG)(CLP), 2018 WL 1157818, at *8 (E.D.N.Y. Mar. 2, 2018) (granting motion to dismiss where amended complaint summarized Floyd without making "any additional relevant allegations" or pointing to "parts of the Floyd decision that are particularly relevant to [plaintiff's] case").

In 2013, the Floyd court appointed an independent monitor to oversee reforms to bring NYPD's stop-and-frisk policy in compliance with constitutional protections. See Floyd , 959 F. Supp. 2d at 667 ; id. , No. 08-CV-1034, Dkt. 372 (S.D.N.Y. Aug. 12, 2013) (remedies opinion); id. Dkt. 466 (S.D.N.Y. July 30, 2014) (order modifying remedies opinion). The Court does not presume that this remedial process precludes any § 1983 claim based on stop-and-frisk arising during or after 2013, but the developments resulting from the Floyd decision undermine Miller's attempt to summarily incorporate its factual findings as a basis for a Monell claim arising out of events in 2015. The issue of timing poses further difficulties for Miller in light of the related case, Davis v. City of New York , 296 F.R.D. 158 (S.D.N.Y. 2013). The Davis plaintiff's challenged NYPD's trespassing enforcement activities on NYCHA property, leading to the approval of a class settlement agreement in April 2015 that initiated changes to the trespassing enforcement program. 296 F.R.D. at 166 (certifying class); id. , No. 10-CV-0699, Dkt. 339 (SAS) (S.D.N.Y. Apr. 28, 2015) (order approving class settlement agreement). Without showing a link between his August 2015 stop and an unconstitutional municipal policy or custom in place at that time, Miller cannot proceed with a Monell claim.